[Sac. No. 6646.   In Bank.   Feb. 10, 1956.]

ARTHUR W. HILL et al., Petitioners, v. SUPERIOR COURT OF HUMBOLDT COUNTY, Respondent.

Arthur W. Hill and Norman C. Cissna, in pro. per., for Petitioners.

Edmund G. Brown, Attorney General, Doris H. Maier and Frederick G. Girard, Deputy Attorneys General, and Harold L. Hammond, District Attorney (Humboldt), for Respondent.

SPENCE, J.—Petitioners seek a writ of mandate to compel the respondent court to allow ''additional compensation to petitioners for services and expenses'' while acting as the court-appointed counsel for Ezra Linwood Witham. The petition was originally filed in the District Court of Appeal, which court issued an alternative writ, and ordered a reference to ascertain the facts.

There is no dispute here concerning the essential facts. Petitioners Hill and Cissna were appointed by the respondent court to defend Witham, who was charged with murder, assault with intent to commit murder, and kidnapping. Petitioner Hill had previously represented Witham by court appointment at the preliminary hearing. It is conceded that petitioners were experienced attorneys and prominent members of the bar of their county; and that they ably represented Witham on his trial. The record before us does not show the precise result of the trial. Apparently Witham was convicted but the death sentence was not imposed. Petitioner Hill, who had represented Witham at the preliminary hearing, also acted for him at the arraignment, and during eight days of trial and one night session. In addition it appears that he spent 25½ hours in preparation for trial. This time included conferences with Witham and his witnesses, researching legal points, and drawing jury instructions, but did not include time spent in reviewing the transcript. Petitioner Cissna performed somewhat similar services except for the fact that he did not represent Witham at the time of the preliminary hearing.

Following the trial, petitioners applied to the respondent court for reasonable compensation under the provisions of section 987a of the Penal Code. They claimed that an award of $5,000 to each petitioner, or a total of $10,000 for both petitioners, would be reasonable compensation within the meaning of said section. After a hearing, the respondent

court found that $500 was a "reasonable sum" to be awarded to each petitioner, or a total of $1,000 for both petitioners, and ordered that amount paid from county funds. Petitioners then filed their petition for a writ of mandate to compel the allowance of a greater sum.

The demurrer and answer to the petition have raised the question of the availability of the writ of mandate to control the discretion of the respondent court. We have concluded, however, that regardless of the procedural question of whether mandamus would be available in the event of a showing of an abuse of discretion, no such showing has been made here, and therefore the writ must be denied.

At the time involved, the pertinent provisions of section 987a of the Penal Code read as follows:

"In any case in which counsel is assigned in the superior court to defend a person who is charged therein with crime, . . . such counsel . . . shall receive a reasonable sum for compensation and for necessary expenses, the amount of which shall be determined by the court, . . . ." (Stats. 1951, chap. 1160, § 2.)

The question of whether the respondent court abused its discretion depends upon the meaning of the phrase "reasonable sum" appearing in the above section. It is the theory of petitioners that the total award of $1,000 is so unreasonably small as to constitute an abuse of discretion. Their view of the meaning of the phrase "reasonable sum" is apparently based upon the criteria ordinarily used in determining what constitutes a reasonable fee in a private transaction between counsel and a solvent client. We are of the opinion, however, that such criteria are of but little assistance here, as the transaction is not a private transaction and the client is not a solvent client but one who "is unable to employ counsel." (Pen. Code, § 987.) As we view the situation, it is essentially one where court-appointed counsel, as officers of the court, perform a public service at public expense. More appropriate criteria, therefore, may be found by considering the amounts deemed proper as compensation for the services of court-appointed counsel in other jurisdictions, and also by considering the compensation paid to public officers generally. Furthermore, section 987a must be read in the light of related statutes, and of the history of the development of the statutory provisions for the payment of compensation to appointed counsel. All of the foregoing factors have a bearing upon the legislative purpose and meaning in enacting the section.

Prior to 1941, there was no statutory provision for the compensation of court-appointed counsel and, in the absence of statute, county funds could not be expended for that purpose. (*Rowe* v. *Yuba County,* 17 Cal. 61; *Lamont* v. *Solano County,* 49 Cal. 158.) In that year, the Legislature enacted section 987a and provided that boards of supervisors might, by ordinance, provide a "reasonable sum" for such compensation out of public funds, and determine the amount thereof. (Stats. 1941, chap. 451, § 1.) In 1951, the section was amended to provide that court-appointed counsel should receive a "reasonable sum" for their compensation out of public funds, "the amount of which shall be determined by the court." (Stats. 1951, chap. 1160, § 2.) It is significant that both before the enactment of the section in 1941 and at all times since, section 6068, subdivision (h), of the Business and Professions Code has provided that "It is the duty of an attorney: . . . (h) Never to reject, for any consideration personal to himself, the cause of the defenseless or the oppressed." Thus the continuing duty of counsel to represent the "defenseless," regardless of personal considerations, must be kept in mind in measuring the extent of the right which the Legislature intended to confer upon counsel by the use of the phrase "reasonable sum" in section 987a.

We now turn to the consideration of the statutes of other jurisdictions providing for the compensation of court-appointed counsel. Respondent has furnished a compilation of such statutes, and petitioners have not challenged its accuracy. It appears that in 10 states (Arizona, Connecticut, Delaware, Florida, Kentucky, Louisiana, Missouri, South Carolina, Tennessee, and Utah) no provision is made for the compensation of court-appointed counsel in any case. In five states (Massachusetts, Mississippi, New Jersey, North Carolina, and Pennsylvania) no provision is made for such compensation except in homicide cases. In eight states where compensation is allowed (Illinois, Iowa, Kansas, Minnesota, Rhode Island, Texas, Washington, and Wisconsin) a per diem fee for trial days has been fixed by statute, and the average per diem in these states is slightly in excess of $25. The highest such per diem is provided in Minnesota and Wisconsin, where $50 is allowed for each trial day and a lesser amount for each day spent in preparation. (Minn. Stats. 1953, chap. 611.07; Wis. Stats. 1951, § 357.26.) In 15 states where compensation is allowed, no fixed per diem is specified, but the trial court fixes the total fee within the maximum limits permitted by

statute. The maximum amount which may be allowed in homicide cases is higher in some of these states than that allowed in other felony cases, but taking the maximum allowed for the preparation and trial of homicide cases, it appears that the average maximum fee for such cases in these 15 states is $258. New York fixes the highest maximum fee for homicide cases. There the maximum is $1,000 if there is but one appointed counsel and $1,500 if there are two appointed counsel, with a further maximum of $1,000 for expenses. (New York Code of Criminal Procedure, § 308, as amended in 1949.) The next highest maximum is that provided in Pennsylvania, where the maximum is $500. (Purdon's Pa. Stats. ann., tit. 19, § 784, as amended in 1953.) In computing the above-mentioned average maximum of $258 in the 15 states, the figure of $1,500 has been used as applicable to New York, and the figure of $500 has been used as applicable to Pennsylvania. Obviously, the maximum allowed in the remaining 13 of these 15 states is much lower. (Alabama $100, Code of Alabama 1940, tit. 15, § 318; Arkansas $250, Acts of Arkansas 1953, Act 276; Georgia $150, Georgia Laws, Nov.-Dec. Session 1953, p. 478; Illinois $250, Illinois Rev. Stats. 1953, chap. 38, § 730; Mississippi $150, Miss. Code 1942, § 2505, as amended 1950; Nevada $300, Nev. Compiled Laws, Supp. 1943-1949, § 11357; New Hampshire $150, Rev. Laws, N. H. 1942, chap. 428, § 3; Oklahoma $25, Okla. Stats. 1951, tit. 22, § 1271; Oregon $150, Oregon Rev. Stats. 1953, tit. 14, § 135.330; South Dakota $50, S.D. Code 1939, tit. 34, chap. 34.1901; Virginia, $50, Code of Virginia 1950, tit. 14, § 14-181, as amended in 1954; West Virginia $50, W. Va. Code 1955 anno., chap. 62, § 6190; Wyoming $200, Wyo. Comp. Stats. 1945, § 10-806, as amended in 1951.) It is thus apparent that the states last mentioned have not deemed it appropriate to fix the compensation to be paid to court-appointed counsel from public funds upon the same basis that compensation is fixed in private transactions between counsel and solvent clients. Furthermore, petitioners have not called our attention to any case in which the compensation of court-appointed counsel has been fixed on that basis in any of the states, including the 14 states which, like California, allow such compensation but do not prescribe by statute any fixed per diem or maximum fee. (Colorado, Idaho, Indiana, Maine, Maryland, Massachusetts, Michigan, Montana, Nebraska, New Jersey, North Carolina, Ohio, Rhode Island, and Vermont.)

■ With respect to the compensation of public officers, it is a matter of common knowledge that the compensation generally paid to district attorneys and public defenders is substantially lower than the amount that would be deemed appropriate for corresponding legal work for private clients. To illustrate, it is only necessary to consider the salary provided at the time for the district attorney of the county in question, and the salary which has since been provided there for the newly created office of public defender. The salary of the district attorney was $9,000 per year, and he was not permitted to engage in private practice. The salary of the public defender is $4,800 per year, and he is permitted to engage in private practice, but he must maintain his office at his own expense for the performance of his public duties.

Petitioners cite the minimum fee schedule adopted by the bar of their county, which prescribes a minimum fee of $750 for representing a defendant charged with murder, and a minimum fee of $250 for representing a defendant charged with any other felony. While such minimum fee schedule may have some bearing in determining appropriate compensation in a private transaction between counsel and a solvent client, such is not the case here. ■ It should be noted in this connection that if the accused had been possessed of $1,000 in cash and had no other obligations, he could not have been deemed to be, in any fair sense of the term, a person "unable to employ counsel" (Pen. Code, § 987); and more particularly in view of the above-mentioned duty imposed upon counsel by section 6068, subdivision (h), of the Business and Professions Code. Is it reasonable to assume that the Legislature intended that the accused who is possessed of $1,000 should be compelled to obtain private counsel out of his own funds, while the accused who is entirely without funds should be entitled to court-appointed counsel who would receive compensation out of public funds in a much greater amount? We believe that the question answers itself.

■ For the reasons stated, we conclude that the criteria to be used in determining a "reasonable sum" for compensation in this type of case are not the same as those ordinarily used in fixing fees for services performed as the result of a private transaction between counsel and a solvent client. On the contrary, we believe that it was intended that such compensation should be determined in the light of counsel's

continuing duty to the "defenseless" (Bus. & Prof. Code, § 6068, subd. (h)); and that the more reliable guides for the determination of proper compensation for court-appointed counsel under our statute are to be found by considering the statutory provisions of other jurisdictions for compensation in such cases, and by considering the general level of compensation paid to public officers for performing legal services in the prosecution and defense of criminal proceedings. ■ Giving due consideration to these criteria, it cannot be said that the trial court abused its discretion in awarding the total sum of $1,000 for the services performed by petitioners. While the award of a somewhat greater amount might have been sustained as being within the discretion of the trial court, it seems entirely clear that the sum awarded cannot be declared unreasonable when compared with the amounts deemed appropriate as compensation for like services under like circumstances.

The alternative writ is discharged and the peremptory writ is denied.

Gibson, C. J., Traynor, J., and McComb, J., concurred.

Shenk, J., concurred in the judgment.

CARTER, J.—I dissent.

The major premise of the majority opinion is that the legislation (Pen. Code, § 987a) requiring the payment from public funds of counsel appointed to defend indigent defendants in criminal cases does not mean what it says when it specifies that "reasonable" fees should be allowed. It says that the test is not what would be reasonable if the defendant had the funds to employ counsel. The test given is something less than that but no other criterion is given except to compare the amounts allowed in other states or paid to a public defender. That is not and should not be the test, and, as applied here, the amount allowed is patently inadequate. The statute requires that the fees be "reasonable," a question later discussed, and it was adopted in a background of much research and effort on the part of lawyers, judges and others interested in endeavoring to make real and effectual the constitutionally guaranteed right to counsel. Section 987a should be interpreted in that light rather than under the test used by the majority which is that the fee is more than nothing but less than the usual and reasonable amount because various states

have refused to allow a sufficient amount to obtain proper representation. Since when has it become the rule that California must follow other states in the adoption or interpretation of liberal legislation?

For illustration it is said by David Mars,* "In many states, however, the compensation paid to assigned counsel falls far below what may be considered reasonable lawyers' fees. . . .

"If it is the State's duty to prosecute and to punish proven criminals, it is equally the State's duty to protect and to uphold the rights of all criminal defendants until the burden of proof against them has been successfully established. Where these defendants are impoverished or bankrupt, some provision for legal assistance in their cases must be made. If such a situation appears ridiculous, then the opposite picture must be imagined: a case in which a poor person is being prosecuted in a criminal proceeding, with no one to defend him or his interests. Such a picture would be at complete variance with the underlying spirit of our system of jurisprudence." (46 Jour. Crim. Law, Crim. & Pol. Sci., 199, 200, 205.) It is said: "Payment of appointed counsel varies strikingly, from five dollars to one thousand dollars, depending on the service and the state. A more realistic examination of this problem is essential if the right to counsel as extended in theory is to become equally substantial in practice." (Beaney, The Right to Counsel in American Courts, p. 139.) And: "Payment of counsel is a subject intimately connected with the duty to appoint counsel and the quality of service furnished by counsel. It is a well-established American principle that one should be paid for work done at the request of, and for the benefit of, others. Nevertheless, from an early date, members of the legal profession, like medical practitioners in analogous circumstances, have given freely of their services to those facing criminal prosecution. Willingness to serve for absurdly low fees and upon insubstantial promises must be classed with the 'volunteered' defense as evidence of legal humanitarianism.

---

*"The author is associated with Government and International Relations at the University of Connecticut. He was formerly with the corresponding department at Rutgers University where he had done his post-graduate studies. At the same time he lectured in The Dep't of History and Political Science in Rutgers Univ. College at Rutgers. His previous effort in the field of criminal law was an article on 'Public Defenders in Connecticut,' which first appeared in *State Government* and was reprinted in the Congressional Record.—Editor." (46 Jour. Crim. Law, Crim. & Pol. Sci., 199.)

"But as the practice of law has become a mass-production enterprise in large cities and as the nation has moved toward industrialization and urbanization, the close contact which lawyers once enjoyed with the general public has been broken, or at least severely weakened. . . .

"The duty of defending prisoners without prospect of payment seems unfair to most attorneys; to some it is a real hardship. Their objection is that most people will not perform useful tasks without pay; when charitable medical care is mentioned, the answer is that doctors can give a short time each day or each week to needy individuals and still maintain a substantial income, whereas lawyers, once appointed, must devote all or nearly all of their time to a pending case, sometimes with the prospect of the trial lasting for weeks.

"Whether resulting from the greater influence of state bar associations upon state governments or from some other cause, statutory provisions of a sort exist in most states for the payment of appointed counsel, but appointed counsel in federal courts continues to go unrewarded by Congress. . . . In general, it can be said that the payments allowed by the various states are far below the fees which most attorneys would charge, although numerous exceptions to such a statement can be found. . . .

"In the absence of a statutory provision there is no duty upon a county to pay appointed counsel. This attitude is based on the argument that the attorney is discharging a public duty, a duty as an officer of the court, or a burden assumed with a lawyer's oath, or simply that there is no obligation on the part of the county. Two exceptions to this reasoning are provided by the highest courts of Indiana and Wisconsin. In each, statutes which denied any duty of the counties to pay attorneys appointed by the court were held invalid. The subject of payment for appointed counsel will undoubtedly receive increased attention as the practice of appointing counsel becomes more general. Certainly the present situation is highly unsatisfactory." (*Id.*, p. 135.) Samuel Rubin of the Maryland Bar has this to say: "In most criminal cases there is more or less unequal combat between the accused on the one hand and the forces of the state on the other. This inequality is so glaring that it is not unusual for the average citizen to assert that the courts exist not for the good of all regardless of wealth or power, but for the benefit of the fortunate few as against the many. This is especially true in the case of the destitute who have no adequate facilities

for their legal defense and for the safeguarding of their rights. There are no adequate legal facilities available for this purpose *without cost to the accused*. *All* destitute persons charged with crime should be able to obtain justice in our courts. They should be given adequate counsel and, what is of equal importance, means of making investigations, in order that the truth in the case may be brought to the attention of the court and jury, and a proper verdict and sentence rendered. . . .

"One of the weaknesses of the assignment system is the fact that the able and experienced lawyers do not care for such appointments. The system leads to abuse and favoritism if the attorney is compensated, and if there is no compensation the system has little value. There are comparatively few lawyers with extensive experience in criminal practice, and lawyers in civil practice rarely have the experience to handle criminal cases adequately. If the fees are small the interest of the attorney is only half-hearted, and he will often advise the client to plead guilty, giving as his reason that by avoiding a protracted trial the prisoner is more likely to receive leniency than if he enters a plea of 'not guilty'. The system rarely works satisfactorily. . . .

"Legal assistance to the destitute in criminal cases is a matter affecting the well-being of the whole community. It is important that the innocent be adequately protected. It is also important that the guilty be justly treated. To this end the poor man charged with crime should be provided with adequate legal protection without cost. Such a provision will dissipate the idea that only the rich can avail themselves of their legal rights, and it will mark a notable step forward in the proper administration of justice throughout the country." (39 Am. Bar Assn. Jour. 893.) The Honorable Henry P. Chandler, Director, Administrative Office of the United States Courts, in discussing the representation of indigent defendants in criminal cases in the federal courts, says: "But notwithstanding the law, the practical provision for counsel in the case of poor persons accused of crime in the federal courts, is only rudimentary and inefficient, because there is no provision for compensating counsel appointed by the courts to represent such persons, or even to reimburse them for their ordinary expenses incurred in the defense. . . .

"For approximately twenty years now the conviction has been growing among persons acquainted with the conduct of criminal cases in the federal courts, that for poor persons the spirit of the Sixth Amendment that persons accused of crime

shall have the assistance of counsel for their defense, is far from being fulfilled. In fact the lack of provision for compensating counsel appointed to defend poor persons accused of crime or even paying their out-of-pocket expenses, has come to be regarded as perhaps the most serious single defect in the federal judicial system.'' (28 Cal. State Bar Jour. 473.) Mr. Harry Graham Balter, an eminent member of the Los Angeles Bar, states: ''To a considerable extent, in the state courts, the traditional concept of assignment of individual members of the Bar to represent indigent accused, without being compensated, but as a gratuitous discharge of the lawyer's professional obligation, has gradually given way to the *more realistic concept* of either (a) the Public Defender, supported by taxes, (b) the Voluntary Defender, patterned after the Public Defender System, but supported by philanthropic funds or by Community Chest funds, or (c) appointment of counsel in a specific case, but with provisions for reasonable compensation. In spite of the decided trend towards more systematized representation for indigent accused, that the constitutional safeguard of adequate legal representation does not always measure up to the standards set by the Supreme Court of the United States, is evidenced by the 'flood of petitions' reaching that court, alleging deprivation of the accused in some of the state courts of due process of law and other constitutional rights, usually centering around the question of proper legal representation afforded the accused.'' (Emphasis added; 24 Cal. State Bar Jour. 114.) In regard to the fees paid in other states to appointed counsel Emery A. Brownell, a leader in the field of legal aid, states: ''Only twenty-three states provide any compensation for attorneys in other than capital cases. In a majority of these states the maximum fees allowed are grossly unremunerative—especially when it is considered that there is no compensation for preparation before the trial except in Wisconsin, and no provision for expenses except in California and Wisconsin.'' (Brownell, Legal Aid in the United States, p. 124.)

Section 987a must be viewed in the light of the foregoing thoughts. Manifestly its object was to assure more efficient and satisfactory representation of indigent defendants in criminal cases. If this court and the superior courts allow only token fees or fees that bear no relation to the services performed, as does the majority here, the object of the

section is defeated. The situation that gave rise to its passage has not been ameliorated.

Section 987a states that a reasonable fee should be allowed. That is a phrase long known in the law and many factors are taken into consideration. ''The reasonableness of the fee charged or allowed must be determined like any other fact in issue in a judicial proceeding, and in making such determination all the facts and circumstances of the particular case, including so far as applicable those enumerated herein below, must be taken into consideration.

''In determining what is a reasonable attorney's fee or allowance for legal services rendered, many and varied elements or factors are to be considered. Among the principal elements or factors to be considered are the amount and character of the services rendered, the nature, and importance of the litigation or business in which the services were rendered, the degree of responsibility imposed on, or incurred by, the attorney, the amount of money or the value of the property affected by the controversy, or involved in the employment, the degree of professional ability, skill, and experience called for and exercised in the performance of the services, and the professional character, qualifications, and standing of the attorney, and also the amount recovered.

''The labor, time, and trouble involved and expended by the attorney, are also elements to be considered, although it has been held that the element of time is of minor importance, and standing alone is not a basis for compensation. Time, in this connection, means the length of time employed by the attorney in preparation for, and trial of, the case, and not the length of the time the litigation has been permitted to remain in court. . . .

''The customary charges or fees, if any, for similar services is an important element to be considered in determining the reasonable value of services rendered by an attorney, and not what the attorney thinks is reasonable; and speaking generally, in the absence of a special contract, an attorney is entitled to the amount that is reasonable and customary in the same vicinity for services of like kind, performed under like conditions and circumstances. Employment of an attorney with knowledge of his rate of charges, without stipulating as to price, may be regarded as evidence of a contract to pay at such rate; but the fact that the client, when informed, during the pendency of a suit, of the charges his attorney is making, fails to express dissatisfaction, is not an

acquiescence in those charges, and does not bind him to pay at such rate for future services in the same suit. An unentered order fixing the compensation of an attorney for services rendered cannot control the amount of recovery in a subsequent action for such services.

*"Bar association schedule of charges.* In determining the reasonableness of an attorney's fee, the schedule of minimum fees prescribed by the local bar association is persuasive, but not conclusive, of the reasonable value of the services; and in the absence of a special or implied agreement, a client is not necessarily bound to pay according to the rates prescribed by the rules and regulations of the bar association. . . .

*"Financial ability or prominence of client.* The financial ability of a client may be taken into consideration, not for the purpose of enhancing the amount above a reasonable compensation, but for the purpose of determining whether or not he is able to pay a fair and just compensation for the services rendered, and as a factor in determining the value of the attorney's services, or as an incident in ascertaining the importance and gravity of the interests involved in the litigation. The prominence of a litigant is ordinarily entitled to no consideration in fixing the value of his attorney's services, although it may sometimes be taken into consideration in fixing the value of the legal services rendered." (7 C.J.S., Attorney and Client, § 191(a)(2).) (See also 5 Am.Jur., Attorneys at Law, § 198.) (See 143 A.L.R. 672.) No doubt many of those factors were taken into consideration by the bar association of the county where the trial was held when it adopted a minimum fee schedule. The amount awarded here ($500 for each attorney) was $250 less than that minimum. The members of the bar in adopting the schedule were well aware of all the overhead costs and other factors to be considered and which were appropriate to the community. They knew more about those things than the courts. The schedule lists "minimum" fees which means the least that should be charged under the most favorable circumstances and still retain a semblance of correlation between the services performed and the compensation received. The fees here allowed are plainly inadequate. The trial consumed eight days which means an allowance of a gross amount of about $63 per day without allowing anything for a retainer or fee for preparation work essential to the presentation of any case to a court or jury, and no allowance was made for office overhead or other expense in the preparation and handling of the case.

The salaries paid district attorneys and public defenders are not a proper measure for determining the compensation allowable to attorneys appointed to defend those charged with crime. With such positions go prestige and a certain steady income which may in a measure account for the difference between it and the cost of handling the legal work on a piece basis. These officials have no overhead expense as do attorneys engaged in private practice and all expenses incurred by such officials in the investigation and handling of criminal cases are paid out of public funds. Moreover, it is a matter of common knowledge that the salaries of government officers do not match what they would receive for similar work in private activities whether it be legal or administrative work.

I would issue the writ on the ground that the court abused its discretion although I believe the order is appealable. It is not an order made after judgment substantially affecting the judgment but is a final order in a special civil proceeding which is made appealable by section 963, subdivision 1, of the Code of Civil Procedure.

Schauer, J., concurred.